Richard S. Busch (SB 5613)
KING & BALLOW
315 Union Street, Suite 1100
Nashville, Tennessee 37201
Telephone:  (615) 259-3456
Facsimile:  (615) 726-541

Kenneth E. Gordon (KG 5703)
James M. Thayer (JT 6545)
GORDON, GORDON & SCHNAPP, P.C.
437 Madison Avenue, 39th Floor
New York, New York 10022
Telephone:  (212) 355-3200
Facsimile:  (212) 355-3292

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

EAR BOOKER ENTERPRISES, INC.,

            Plaintiff,

v.

SONY MUSIC ENTERTAINMENT,

            Defendant.

Case No. 12 Civ. 2385 (AT)

**FIRST AMENEDED COMPLAINT FOR BREACH OF CONTRACT; BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING**

**DEMAND FOR JURY TRIAL**

Plaintiff Ear Booker Enterprises, Inc. ("Ear Booker"), by and through its attorneys, for its

Complaint against the Defendant named above alleges, on knowledge as to its own behavior and

on information and belief as to the behavior of others, as follows:

### Parties

1.     Plaintiff Ear Booker is a California Corporation with its principal place of business at

10250 Constellation Boulevard; Los Angeles, California 90067.

2.      Defendant Sony Music Entertainment ("Sony") is a Delaware General Partnership, whose partners are citizens of Delaware and New York.  Sony's principal place of business is located at 550 Madison Avenue, New York, NY 10022.

### Jurisdiction and Venue

3.      The jurisdiction of this Court is based upon 28 U.S.C. § 1332 as there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.  This action for declaratory judgment is brought pursuant to 28 U.S.C. § 2201 which is within the exclusive jurisdiction of federal courts pursuant to 28 U.S.C. § 1331.  Venue is proper in the District pursuant to 28 U.S.C. §§ 1391 and 1400(a).

4.      Personal jurisdiction over Sony is proper in this Court on the grounds that (a) Sony transacts business in the State of New York; (b) Sony's wrongful conduct, alleged herein, occurred in the State of New York and in this District; and, (c) the contracts that are the subject of this action were entered into in this District.

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(c).

### Factual Allegations

6.      Ear Booker is a corporation formed and controlled by Alfred Matthew Yankovic p/k/a "Weird Al" Yankovic.  The purpose of the corporation is to provide the professional and artistic services of Mr. Yankovic.

7.      On or about November 1, 1982 Ear Booker entered into a recording agreement with Sony's predecessor in interest, Scotti Brothers Industries, Inc.  On or about February 23, 1990, Ear Booker entered into a separate recording agreement with Scotti Brothers Industries, Inc., which became effective as of September 24, 1998.  On or about September 27, 1999, Ear Booker entered into an agreement with Sony's predecessor, Volcano Entertainment III, LLC (Sony and

its predecessors are collectively referred to as "Sony" hereinafter), regarding a VH-1 cable channel special. On or about December 14, 2002, Ear Booker entered into a recording agreement, effective as of July 1, 2002 with Sony. Also, on or about December 14, 2002, Ear Booker entered into an amendment of the 1982 and 1990 agreements. In addition, between 1982 and 2009 Ear Booker and Sony entered additional amendments and settlement agreements (all the agreements are collectively referred to as the "Agreements").

8.　　Pursuant to and during the term of the Agreements, Ear Booker caused Yankovic to create certain audiovisual performances and certain "master" sound recordings of musical performances (the "Masters") which were made and delivered to Sony, and which Masters Sony had agreed to manufacture, distribute, sell, and license for sale and distribution in various configurations.

9.　　In consideration of Ear Booker and Yankovic's performance under the Agreements, Sony agreed to pay Ear Booker under a certain royalty structure and to account to Ear Booker under that royalty structure. In order to ensure Sony correctly accounted to and paid Ear Booker, the Agreements gave Ear Booker the explicit right to inspect Sony's books and records through an audit procedure.

10.　　Since entering into the Agreements, and despite its obligations under the Agreements, Sony has consistently failed to properly account to and pay Ear Booker under the royalty structure set forth in the Agreements.

11.　　During the period from July 1, 2003 through the present, Sony has failed to properly account to and pay Ear Booker under the royalty structure set forth in the Agreements.

**Ear Booker Audits Sony**

12.     Pursuant to its audit rights under the Agreements, Ear Booker, through outside accountants, performed an audit of Sony's books and records regarding Sony's accountings and payments to Ear Booker for the period July 1, 2003 through December 31, 2008 (the "Audit").

13.     On or about March 9, 2010, Ear Booker provided Sony with an audit report, thereby providing Sony specific written notice of Sony's breach of the Agreements.  On or about May 17, 2010, Sony responded to the Audit with a "Weird Al Preliminary Audit Rebuttal."  On December 9, 2010, Sony provided Ear Booker with an audit rebuttal falsely claiming Sony had overpaid Ear Booker $80,231 during the periods audited.  On September 20, 2011, Ear Booker provided Sony with revised calculations of the amounts due from the audit specifically objecting to Sony's failure to correctly account to and pay Ear Booker in violation of numerous provisions of the Agreements.  On February 13, 2012, Sony responded to the revised audit amounts calculated.  In its response, Sony included a revised overpayment calculation incorrectly claiming it had overpaid Ear Booker by $38,112 during the periods audited.

14.     On March 3, 2011, Ear Booker and Sony agreed to enter an initial tolling agreement. Before that tolling agreement expired, on April 20, 2011, Ear Booker and Sony entered into a tolling agreement which allowed suit over the claims of the Audit to be filed up to and including September 30, 2011.  In that tolling agreement, Ear Booker and Sony expressly acknowledged "that no portion of the Audit Period is barred by the statute of limitations or by any contractual limitation periods."  On or about September 8, 2011, Sony agreed to extend that tolling agreement until March 31, 2012.  Sony then made it clear it would not extend the tolling agreement any further, so that good faith negotiations in regards to the Audit could continue. This action on the part of Sony forced Ear Booker to file the instant suit.

### Specific Breaches by Sony Disclosed by the Audit

15.     The Audit shows Sony has incorrectly reported to Ear Booker the quantity of products sold, has incorrectly categorized those products, and has incorrectly paid Ear Booker for products for which it has accounted. Additionally, the Audit revealed Sony has failed to account to and pay Ear Booker for monies and other valuable consideration Sony received even though a portion of those receipts are directly attributable and allocable to the Masters. Sony's failure to correctly account to and pay Ear Booker is the factual and legal cause of monetary damages to Ear Booker in excess of at least $3,000,000.

16.     The Audit showed Sony incorrectly charged Ear Booker at least $8,061 in connection with the "Close But No Cigar" audiovisual production. Specifically, Sony double charged Ear Booker by at least $8,061 advanced royalty payments to Copernicus Studios and John K. Enterprises. Under the terms of the Agreements, Sony is not allowed to deduct costs it does not actually incur or expenses which are not actually owed to third parties. Additionally, Sony reported to "John K Enterprises" royalty earnings of 100% of net receipts. Under the terms of the Agreements, John K Enterprises was only entitled to a one third share of the net receipts with Ear Booker to be paid one third of net receipts. These incorrect charges and calculations have resulted in Ear Booker being underpaid an amount in excess of $8,061.

17.     The Agreements require Sony to account to and pay Ear Booker for exploitations of content created by Mr. Yankovic. Article 12 of the 2002 Agreement specifically requires Sony to account to and pay Ear Booker for audiovisual content. In addition to the foregoing underpayments, Sony also underreported royalties related to "Close But No Cigar" in an amount of at least $1,857.

18.     Sony also levied additional incorrect charges to Ear Booker accounts, as described below, in an amount in excess of $260,000.

19.     For instance, Sony improperly recouped $79,908 in costs for the "Al TV VH-1 Special." Sony's predecessors in interest have regularly treated such costs as marketing costs and have not recouped them.  Under the terms of the Agreements, marketing and promotion costs are not recoupable except under some inapplicable specifically delineated exceptions.  Sony has treated these costs as recoupable Audiovisual Production Costs.  However, the Agreements contain specific restrictions, including the restrictions in paragraph 12.04 of the 2002 Agreement, as to the kinds of video products for which corresponding costs can be recouped, and this "Al TV VH-1 Special" does not fit into the recoupable categories.  Also, paragraph 12.01(b)(1) of the 2002 Agreement requires the budget for any Audiovisual Production Costs to be determined mutually by Sony and Ear Booker.  The "Al TV VH-1 Special" budget was not mutually determined. Sony determined the budget without consulting Ear Booker.  In fact, when Ear Booker requested a copy of the budget, Sony failed to provide it.  Thus, Sony was not entitled to recoup this $79,908 in costs.

20.     The Audit also showed that Sony improperly recouped non-recoupable "Normal Engineering Costs."  For instance, Sony improperly recouped $4,210 as mastering costs. However, the documentation provided by Sony shows this $4,210 charge was for EQ for stereo and 5.1 mixes. This type of charge is a "Normal Engineering Cost" and is not recoupable under the Agreements.

21.     Further, Sony has charged Ear Booker with $10,381 of charges for which it failed to provide documentation during the Audit.  It is a breach of the Agreements to deduct amounts from the monies due Ear Booker without a basis for such deductions and Sony failed to

6

document the basis for at least $10,381 during the Audit. Nothing in the Agreements allows Sony to deduct expenses it does not actually incur.

22. Additionally, Sony has incorrectly cross-collateralized costs related to the Ultimate Video Collection against royalties accrued in promotional video accounts. Improperly charged costs related to the Ultimate Video Collection have deprived Ear Booker of at least $39,313. Sony has acknowledged it is in breach of the Agreements by improperly charging $9,010 to Ear Booker even though this $9,010 was a non-recoupable "Normal Engineering Cost." However, Sony has failed to admit the remaining charges disputed from the Audit were improperly recouped. Among the charges which Sony has failed to admit were incorrectly charged are additional "Normal Engineering Costs" such as $1,511 paid to "Audioplus Video" to compile video sources. Sony has also stated that it can recoup charges under the theory that 92% of the videos in the Ultimate Video Collection are promotional videos and therefore 92% of the costs are recoupable from Ear Booker's existing Promotional Video accounts. In fact, none of the costs of the Ultimate Video Collection are recoupable. Under the terms of the 2002 Agreement, as detailed in Article 12, Commercial Video costs are not recoupable from Promotional Video earnings. The Ultimate Video Collection is a Commercial Video as defined by Article 12. While the Ultimate Video Collection did contain some previously created Promotional Videos, the costs associated with those previously created videos had already been incurred by Ear Booker and Sony had previously fully recouped those costs. Thus, all the Ultimate Video Collection costs Sony charged during the periods audited were costs incurred solely in connection with the Commercial Video and are not chargeable to Ear Booker's Promotional Video accounts. This is a breach of the Agreements which directly caused financial harm to Ear Booker.

23.     Sony, in responding to the Audit, has admitted it is in breach of the Agreement based on its attempt to recoup $4,597 in non-recoupable archive costs.  This is money immediately due to Ear Booker.

24.     Sony has also breached the Agreements by charging Ear Booker at least $5,000 in unauthorized independent promotional charges.  Sony claims such charges are proper because Mr. Yankovic's manager was aware of Sony's marketing efforts.  However, paragraph 8.04(f) of the 2002 Agreement is clear that in order for such charges to be recoupable those charges must be "incurred at [Ear Booker's] written request or with [Ear Booker's] written approval."  Neither Ear Booker, Mr. Yankovic, nor Mr. Yankovic's manager ever approved the $5,000 in independent promotional costs charged to Ear Booker.

25.     The Audit revealed that Sony has charged Ear Booker with $43,790 in non-recoupable video costs.  Testing during the Audit showed that Copernicus Studios gave Sony a discount that Sony did not share with Ear Booker.  Thus, Sony attempted to recoup costs which it did not actually incur.  Further, Sony failed to provide documentation regarding its agreements in regards to video costs.  Sony also represented to Mr. Yankovic's manager that these video costs would not be charged Ear Booker.  The Audit was unable to disclose the exact amount Sony incorrectly charged Ear Booker because Sony did not provide backup to substantiate all charges or agreements.  Additionally, some of the backup documentation that was provided was unexecuted.  Moreover, it appears that Sony has included in excess of $25,000 of "Battery Studios" costs which are "Normal Engineering Costs" and non-recoupable.  Sony has admitted in other instances that archive and encoding costs are non-recoupable.  However, in regards to Battery Studios, Sony has charged those costs to Ear Booker.  Each of these acts is a breach of the Agreements.

26.     The accountants conducting the Audit extrapolated additional overcharges by Sony.  This extrapolation is based on reliable testing of data, provided by Sony, which indicates that Sony has incorrectly charged a minimum of an additional $65,000 for non-recoupable charges in breach of Sony's obligations under the Agreements.

27.     Sony also failed to pay Ear Booker at least $18,000 in domestic publishing royalties. Article 11 of the 2002 Agreement controls Sony's obligation to pay publishing royalties to Ear Booker.  Sony admits it breached the Agreements by failing to pay $1,134.  Sony denies the remainder of this claim.  This failure to correctly account to and pay domestic publishing royalties to Ear Booker is a breach of the Agreements as described below.

28.     This underpayment has been confirmed by documentation provided by Sony.  The documentation provided by Sony revealed that Sony failed to pay all of the publishing royalties due for physical sales of the albums *Running With Scissors* and *Poodle Hat*.  Sony claims it paid the full royalties because the amount of royalties payable are capped and the remaining royalties, under the cap, were paid to uncontrolled publishers.  However, Sony failed to provide supporting evidence for such payments.  Sony did not provide licenses, cancelled checks, royalty statements or other evidence to support its claim.  Thus, on information and belief, Sony had no right to deny Ear Booker its full publishing royalties because no uncontrolled publishers were paid.  The Agreements do not allow Sony to fail to pay Ear Booker if it does not actually incur other copyright expenses.

29.     Sony has admitted to failing to pay $1,134 for digital publishing royalties.  However, Sony continues to dispute it owes the remaining $6,591 disclosed by the Audit.  Sony claims publishing royalties were owed by the digital service providers and not by Sony.  However, Sony is responsible for paying publishing royalties on video tracks and some of the tracks in question

appear to be video tracks. Additionally, Sony has reported negative streaming royalties of $3,690 in connection with "Don't Download this Song" which reduced royalties payable to Ear Booker by $3,690. Sony could not have incurred this negative revenue from a streaming service. Sony has offered no legitimate explanation for this loss and thus cannot charge the purported loss to Ear Booker.

30.     Additionally, Sony has failed to pay the mandated $0.24 mechanical rate for each ringtone during the period prior to March 1, 2009 as required by Article 11 of the 2002 Agreement and the Copyright Act. This rate, officially adopted in 2009, is retroactive under the terms of the Copyright Act. Sony has failed to apply the rate retroactively and has thus deprived Ear Booker of royalty income. This failure has resulted in Ear Booker being underpaid by at least $189.

31.     Upon information and belief, Sony has also breached the Agreements by failing to pay Ear Booker for free goods in excess of those allowed under the 2002 Agreement. Paragraph 9.04.1(b) requires Sony to pay the full royalty due for free goods offered pursuant to special sales programs, promotions, or marketing campaigns of limited duration in excess of nine percent (9%) of the aggregate sales of albums distributed during a twelve month period. During the period audited, Sony failed to pay Ear Booker for free goods offered outside this contractual limitation. This has resulted in Ear Booker being underpaid for both Master and publishing royalties in an amount in excess of $155,000.

32.     Sony has admitted some sales were underreported to Ear Booker. However, Sony's admission makes it unclear the exact amount of sales that were underreported or the extent to which Sony has cured such underreporting. Sony's failure to pay these claims in full is a breach of the Agreements.

33.     Further, paragraph 9.03(h)(ii) of the 2002 Agreement obligates Sony to pay Ear Booker "an amount equal to thirty-three percent (33%) of the Net Receipts from any royalty, fee, or other payment received by us and directly attributed to a Master" licensed for "streaming" transmissions.  Included in such transmissions are "ringbacks."  However, Sony has failed to account to Ear Booker properly for these ringbacks as streaming income resulting in an underpayment of more than $11,615.

34.     Sony also failed to pay any royalties for what it terms "FGD" online/digital transmissions.  Under the terms of paragraph 9.04 of the 2002 Agreement, Sony is obligated to pay a percentage of its Net Receipts to Ear Booker for this type of online/digital transmissions. While it appears that Sony may not have received any royalties for these "FGD" online/digital transmissions, Sony has refused to disclose the agreements between Sony and the digital service providers regarding these "FGD" online/digital transmissions.  Upon information and belief, Ear Booker asserts Sony has received advances and/or other valuable consideration in exchange for allowing digital service providers to give away "FGD" online/digital transmissions.  As such, a portion of whatever valuable consideration was received by Sony is attributable to the Masters and Ear Booker is entitled to a portion of that consideration.

35.     Article 9 of the 2002 Agreement obligates Sony to pay royalties to Ear Booker for the exploitation of the Masters.  The Audit revealed additional unreported and unpaid activity that was omitted from the incomplete "pending" and "unmatched" report information that Sony provided.  For example, Sony's accounting shows payments on only 5,911 units of the digital video track "Amish Paradise," but other accounting documents indicate there are an additional 17,817 unreported domestic digital units of "Amish Paradise."  In addition, Sony claims it has not received any synch income for Australia's "20 to 1."  However, a significant amount of time

has passed since that income should have been received by Sony and Ear Booker has still not been paid a royalty on that income. Likewise, Sony failed to account to and pay Ear Booker, for the *"Weird Al" – Live! VH-1* special, as required by the 1990 Agreement regarding contingent compensation. Sony provided little or no documentation of its receipts derived from the VH-1 special, or any of its expenses in connection therewith. This failure has resulted in the underpayment of Ear Booker in an amount greater than $32,000.

36.    Sony also admits it owes Ear Booker unpaid publishing royalties, due under Article 11 of the 2002 Agreement, which are "unmatched" and/or "pending," even though Sony failed to allow access to its complete unmatched and pending files during the Audit. Sony has stated that the unmatched publishing royalties due are in the amount of $6,345. Sony has represented that it will pay unmatched royalties to Ear Booker, but it has denied Ear Booker an accounting in regards to unmatched and pending publishing royalties. Upon information and belief, Sony has failed to pay Ear Booker in excess of $10,000 in unmatched publishing royalties during the period audited.

37.    Additionally, the Audit showed that Sony received payments for third party licensing of video content to entities such as, but not limited to, MTV and YouTube. Ear Booker was not paid a royalty on much of this third party video licensing even though a portion of the license fees were directly attributable, identifiable, and allocable to the licensing of the Masters. Paragraph 19.02 of the 2002 Agreement guarantees payments on income that is "made solely in respect of Masters hereunder and that [is] directly and specifically attributable, identifiable and allocable to such Masters." Sony's failure to pay a royalty on this income is a breach of the Agreements. This breach of the Agreements by Sony is the direct cause of financial harm to Ear Booker in an amount in excess of $150,000.

38.     Further, Sony has received monetary awards and settlements from numerous lawsuits and disputes regarding the piracy of recordings including the Masters.  Such lawsuits and disputes have resulted in Sony receiving monies or other consideration from entities such as Napster, Kazaa, Audiogalaxy, Grokster, BearShare, and others.  Again, paragraph 19.02 of the 2002 Agreement requires Sony to account to and pay Ear Booker for income that is capable of allocation to Mr. Yankovic's Masters.  Sony has failed to provide Ear Booker with an accounting regarding the amounts actually received.  A portion of the monies or other consideration received by Sony is attributable to the Masters and Ear Booker is entitled to a royalty on that portion of Sony's receipts.  Sony's refusal to account to and pay such royalties to Ear Booker has resulted in Ear Booker suffering direct financial harm in an amount that cannot be determined until Sony provides documentation of its receipts and the basis for the allocation of those receipts.

**Sony Fails to Properly Pay Ear Booker for YouTube Licensing Income**

39.     Under paragraph 9.03(h)(ii) of the 2002 Agreement, Sony is obligated to pay Ear Booker "an amount equal to thirty-three percent (33%) of the Net Receipts from any royalty, fee, or other payment received by us and directly attributed to a Master" licensed for "streaming" transmissions.

40.     The 2002 Agreement defines the term "Net Receipts," in relevant part, as "an amount equal to the gross sums received by us in the United States for and directly and specifically attributable, identifiable, and allocable to the license of any Master to a third-party Licensee . . . ."  This means that Ear Booker is entitled to a percentage of Sony's Net Receipts whenever Net Receipts are capable of allocation to a Master created by Mr. Yankovic.

13

41.     Under the terms of the 2002 Agreement, "streaming" transmissions are also refered to as "non-permanent transmissions (i.e., where the end user is unable to make a permanent copy)." This definition includes the types of type of exploitations in which YouTube engages.

42.     On February 14, 2005, YouTube was first launched.   On September 17, 2006, an unofficial video for "White and Nerdy" was placed on YouTube.  On September 18, 2006, the first official "White & Nerdy" video was posted on YouTube.  The "White and Nerdy" video on YouTube went viral immediately and was one of, if not the most, viewed video on YouTube at that time.

43.     On October 9, 2006, Google purchased YouTube and Sony announced that it had entered into a "content license agreement" with YouTube.  The agreement between Sony and YouTube is a retroactive and prospective license giving permission for YouTube to exploit content owned or controlled by Sony including content created by Mr. Yankovic.

44.     Further, during the period audited, Sony was given an equity stake in YouTube.  This equity stake has a monetary value.  Sony was given an equity stake in YouTube in exchange for YouTube receiving a license to perform and distribute Sony's content.  Upon information and belief, a portion of this value related to YouTube's exploitations prior to the execution of the license agreement and a portion of this value related to YouTube's exploitation after the execution of the license agreement.  This equity stake is, therefore, a payment received by Sony in exchange for YouTube being able to license Sony's content.

45.     At the time the equity stake in YouTube was given to Sony, among the most popular content on YouTube was "White and Nerdy," a work created under the Agreements, the exploitation of which requires Sony to account to and pay Ear Booker.  A portion of Sony's equity share in YouTube is directly attributable and allocable to "White and Nerdy," as well as

other content created by Mr. Yankovic. In fact, one of the reasons Sony had so much leverage in negotiating with YouTube was that Mr. Yankovic's videos were so popular they drove significant traffic to the YouTube website. Thus, in order to have access to this extremely valuable content, YouTube had to offer Sony a lucrative deal. Sony has failed to account to and pay Ear Booker for the exploitation of Mr. Yankovic's content which resulted in Sony obtaining an equity stake in YouTube.

46.     On October 12, 2006, Sony stated the *official* "White & Nerdy" video had been viewed 6 million times. This number excludes user generated "unofficial" video views which make up a significant portion of the overall views of "White & Nerdy." This is confirmation from Sony that "White & Nerdy" was one of the most popular videos ever on YouTube at the time the license agreement was executed. Because of the popularity of Mr. Yankovic's content, a significant portion of the compensation Sony received from YouTube should have been attributed to Ear Booker.

47.     The revenue received from YouTube was not only allocable and attributable to Mr. Yankovic's Masters under the Net Receipts provision of the 2002 Agreement, but Sony actually paid certain amounts to Ear Booker, which shows Sony understood its obligation to do so. Sony breached the Agreements to the extent what it paid Ear Booker does not constitute allocation, and breached its duty of good faith and fair dealing to the extent there was any allocation, by not properly and fairly, and in good faith, allocating revenue to Mr. Yankovic in proportion to the views of Mr. Yankovic's videos on YouTube. Upon information and belief, Sony has allocated money to other artists in excess of these artists' appropriate share. Sony's conduct in this regard denies Ear Booker the benefit of the Agreements by failing to allocate license revenue fairly. This is the direct cause of financial harm to Ear Booker.

**Sony Improperly Accounts for Licensing of Master Recordings to Unaffiliated Licensee Download Providers**

48.    The Audit revealed that Sony failed to properly account to and pay Ear Booker for Masters licensed to third-party Music Download and Mastertone Providers, such as iTunes (Apple), eMusic, amazon.com, Verizon Wireless and others.  Music Download and Mastertone Providers are third-parties that licensed the Masters from Sony and then distributed permanent music downloads, mastertones, and ringtones to end users on computers, cell phones, or other devices.

49.    The 2002 Agreement states, in Paragraph 9.03(h), that "[n]otwithstanding" any other royalty provision of the Agreement, Sony "will credit [Ear Booker's] royalty account with an amount equal to fifty percent (50%) of the Net Receipts from any royalty, fee, or other payment received by us directly attributed to a Master licensed by us for use (A) in the manufacture and/or distribution of Phonograph Records."

50.    Likewise Paragraph 9.03(a) states, "on Phonograph Records manufactured and sold by an unaffiliated third-party Licensee (other than our regular distributor of Phonograph Records in the territory concerned), your royalty will be fifty percent (50%) of the Net Receipts from the sale of those Phonograph Records."

51.    Further, the 2002 Amendment made Paragraph 9.03, and the related provisions, of the 2002 Agreement applicable to all Masters owned by Sony for exploitation of those Masters after December 31, 2000.

52.    Under the terms of the 2002 Agreement, permanent music downloads, mastertones, and ringtones are "Phonograph Records."

53.    Sony licensed the Masters to third party Music Download and Mastertone Providers, so that those third party Music Download and Mastertone Providers could distribute permanent

music downloads, mastertones, and ringtones to the public. Sony received payment for this licensing and continuously and persistently failed to account to and pay Ear Booker the 50% of net receipts due to it pursuant to the terms of the Agreements.

54.     Instead, between July 1, 2003 and present, Sony systematically accounted to and paid Ear Booker for the Masters licensed to third parties, including third party Music Download and Mastertone Providers at lower royalty rates, under provisions of the Agreements, which are applicable only to Phonograph Records sold by Sony, and are not applicable to the licensing of the Masters to third parties. Further, Sony took unwarranted and unallowed deductions from the small amount of royalties it actually paid to Ear Booker.

55.     On September 20, 2011, Ear Booker provided Sony with the revised calculation of amounts due from the Audit, specifically informing Sony of its wrongful method of paying Ear Booker in regards to Masters licensed to Music Download and Mastertone Providers.

56.     In response to the Audit, Sony stated that it "either sells download tracks directly to consumers through digital retailers acting as [Sony's] agents, or (as in the case of Apple) the digital retailers purchase tracks on a wholesale basis and resell them to consumers."

57.     Sony's response to Ear Booker's Audit is incorrect. Sony does not sell permanent music downloads, mastertones, and ringtones directly to consumers. Nor does Sony wholesale permanent music downloads, mastertones, or ringtones. Instead, Sony licenses Masters to unaffiliated Music Download and Mastertone Providers, licensees, and those Music Download and Mastertone Providers then reproduce the Masters to create permanent music downloads, mastertones, and ringtones which those third party licensees sell directly to consumers. Sony's position was explicitly rejected in *F.B.T. Prods., LLC v. Aftermath Records*, 621 F.3d 958 (9th Cir. 2010).

58.    Sony also claims that even if the Masters are licensed to Music Download and

Mastertone Providers those licensed Masters are not covered by the Masters licensed provision

of the Agreement, but are instead covered by the record royalty rate in Paragraph 9.01 of the

Agreement.  In making this argument, Sony relies on Paragraph 9.03(e)(i) of the Agreement.

Paragraph 9.03(e)(i) states:

> On New Media Records the royalty rate will be one hundred percent (100%) of
> the otherwise applicable royalty rate less a distribution fee of fifteen percent
> (15%); provided, however, in the event that New Media record concerned is a
> Single, the otherwise applicable royalty rate will nevertheless be determined
> based on the otherwise applicable Album rate (as opposed to the applicable
> Singes rate) unless the Master embodied on such New Media Record is then
> currently being marketed and/or promoted as a Single.  Notwithstanding the
> foregoing, in no event will the royalty rate with respect to any New Media Record
> exceed fifty percent (50%) of our Net Receipts on that Record.

Permanent music downloads, mastertones, and ringtones are New Media Records.  This

provision states that New Media Records will be paid under "the otherwise applicable royalty

rate." The otherwise applicable royalty rate for Masters licensed to third parties including Music

Download and Mastertone Providers is fifty percent of Sony's net receipts as stated in Paragraph

9.03(a) & (h)(i).

59.    In defining "Net Receipts," Paragraph 19.20 of the 2002 Agreement explicitly

contemplates that New Media Records, which include permanent music downloads, mastertones,

and ringtones, will, if licensed, fall under a Net Receipts calculation as contemplated by

Paragraph 9.03(h)(i).  Paragraph 19.20 states, in pertinent part:

> "Net Receipts" means an amount equal to the gross sums received by us in the
> United States for and directly and specifically attributable, identifiable, and
> allocable to the license of any Master to a third-party Licensee (the "Gross
> Receipts"), less all costs paid or incurred by us, whether or not to a third party . . .
> . Notwithstanding anything to the contrary contained in this paragraph 19.20, we
> will not deduct any administration fee or a so-call "overhead payment" from
> Gross Receipts, except as provided for with respect to our distribution fee on New
> Media Records.

60.     Further, by its terms, Paragraph 9.01 only applies to sales through "Normal Retail Channels." Normal Retail Channels means:

> Net Sales of Phonograph Records hereunder through us or our principal distributor(s), in the country in question for resale through record or other retail stores including on-line retail merchants, but only to the extent the transaction involves an on-line order fulfilled by Merchant by means of the shipment of a physical, tangible Record to the consumer via mail delivery services (e.g., UPS, US Postal Service, etc).

This definition, by its own clear unambiguous terms, only applies to sales by Sony and re-sales by third parties limited to physical tangible records and not music downloads, ringtones, and mastertones.  This provision also, by its clear terms, excludes licenses by Sony to third parties. Indeed, Sony relies solely and improperly on provisions and concepts that only apply when it or its affiliated companies are selling records themselves, and not when Sony licenses master recordings to unaffiliated licensees for distribution.

61.     Finally, the "notwithstanding" language prior to the Masters licensed provision, in Paragraph 9.03, means Paragraph 9.03's 50% of net receipts provision is applicable to Masters licensed to Music Download and Mastertone Providers regardless of the language in Paragraph 9.01 or any other royalty provision.  This exact issue was decided in *F.B.T. Prods., LLC v. Aftermath Records*, 621 F.3d 958 (9th Cir. 2010).

62.     Sony's failure to correctly pay Ear Booker for permanent music downloads, mastertones, and ringtones income derived from Masters licensed to Music Download and Mastertone Providers has resulted in Sony underpaying Ear Booker by at least $2,000,000.

63.     Following the Audit, instead of correcting this underpayment and agreeing to correctly account to and pay Ear Booker, Sony has incorrectly claimed it overpaid Ear Booker by $74,495 for permanent music downloads, mastertones, and ringtones derived from Masters licensed to

Music Download and Mastertone Providers.  Sony has attempted to state it is entitled to recoup this $74,495; however, that amount is not due to Sony.  Further, Sony has continued to deny its obligation to properly account to and pay Ear Booker for permanent music downloads, mastertones, and ringtones derived from Masters licensed to Music Download and Mastertone Providers.

### Sony's Improper Transfer of Income From Foreign Affiliates

64.     Paragraph 19.13 of the 2002 Agreement explicitly states, "Licenses to our affiliates shall be on an arms-length basis."

65.     Sony has numerous foreign affiliates throughout the world which it either owns in whole or in part.  These foreign affiliates are controlled in whole or in part by Sony.

66.     Like all major record labels, upon information and belief, Sony has intercompany licenses which allow its foreign affiliates to exploit Sony's content.  Upon information and belief, these intercompany licenses allow for Sony's foreign affiliates to keep a significant portion of licensing income above and beyond any amount that is justifiable or related to the services these affiliates provide.

67.     Sony has created such an intercompany license in order to improperly and unjustifiably keep receipts rightfully due to Ear Booker in foreign territories and thus avoid paying Ear Booker for those receipts.  These license agreements are not at arm's length.  This action is the direct cause of financial harm to Ear Booker and is a breach of the 2002 Agreement.

68.     For the period audited, Sony has failed to account for and pay Ear Booker amounts well in excess of $3,000,000, and in a specific amount to be determined at trial.  Upon information and belief, Sony's failure to properly account to and pay Ear Booker continues in the royalty

periods following the Audit which has and will continue to result in additional monetary damages not yet known to Ear Booker.

69.     Further, Sony's failure to timely pay Ear Booker, as required by the Agreement, has caused Ear Booker to be deprived of the use of substantial funds causing additional financial harm.

### Claim I
### Breach of Contract

70.     Ear Booker realleges each and every allegation in paragraphs 1 through 69 as if fully set forth herein.

71.     The Agreements between Sony and Ear Booker are valid and enforceable.

72.     Sony has failed to comply with the terms of the Agreements, and failed to fulfill its obligations under the Agreements by failing to properly account to and pay Ear Booker royalties. Sony's failures include, but are not limited to, incorrectly calculating products sold, incorrectly paying Ear Booker based on products sold, failing to allow Ear Booker a full and fair opportunity to conduct an audit, recouping monies not owed to Sony, failing to account to and pay Ear Booker fifty percent (50%) of Sony's net receipts from its licensing of the Masters to third parties, including unaffiliated Music Download and Mastertone Providers, not allocating net receipts from licensed income, and entering into license agreements with foreign affiliates that are not at arm's length.

73.     By reason of the foregoing and other acts not presently known by Ear Booker, Sony has knowingly and materially breached its contractual obligations to Ear Booker under the Agreements.

74.     Sony's material breach of the Agreements is the legal cause of substantial damage to Ear Booker for which Ear Booker seeks monetary damages in an amount to be determined at the time of trial, which upon information and belief is in excess of $3,000,000.

### Claim II
### Breach of Contract (Breach of the Duty of Good Faith and Fair Dealing)

75.     Ear Booker realleges each and every allegation in paragraphs 1 through 74 as if fully set forth herein.

76.     The Agreements between Sony and Ear Booker are valid and enforceable.

77.     Sony's failure to reasonably allocate money and other payments received from third-party licensees, such as YouTube, frustrates the purpose of the Agreements as it deprives Ear Booker of funds which are directly attributable to Masters created by Mr. Yankovic.  Under the terms of the Agreements, Sony has an obligation to allocate this income, and also an inherent obligation to utilize its discretion fairly, and in good faith.  Sony has abused that discretion by allocating income received from these third-parties in a manner which is arbitrary and unsupportable.

78.     By reason of the foregoing and other acts not presently known by Ear Booker, Sony has knowingly and materially breached its contractual obligations by violating its duty of good faith and fair dealing.

79.     Sony's actions in wrongfully failing to appropriately allocate licensed income frustrates the purpose of the Agreements and is the legal cause of substantial damage to Ear Booker for which Ear Booker seeks monetary damages in an amount to be determined at the time of trial.

### Prayer for Relief

WHEREFORE, Ear Booker prays for judgment against Sony as follows:

1.      Compensatory damages for Sony's breach of contract and its breach of contract through its violations of its duty of good faith and fair dealing in excess of $3,000,000, the exact amount of which to be determined at the time of trial;

2.      An award of actual and reasonable attorneys' fees and costs for services rendered to Ear Booker in this action;

3.      An award of pre- and post-judgment interest;

4.      A trial by jury on all triable issues; and,

5.      All such other and further relief as the Court deems just and proper.

By:

Richard S. Busch (SB 5613)
KING & BALLOW
315 Union Street, Suite 1100
Nashville, Tennessee 37201
Telephone:  (615) 259-3456
Facsimile:  (615) 726-541

Kenneth E. Gordon (KG 5703)
James M. Thayer (JT 6545)
GORDON, GORDON & SCHNAPP, P.C.
437 Madison Avenue, 39th Floor
New York, New York 10022
Telephone:  (212) 355-3200
Facsimile:  (212) 355-3292